UNITED   STATES   DISTRICT   COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STANDMILL S.R.O.,<br><br>                              Plaintiff,<br><br>        -against-<br><br>VITALY FARGESEN,  IGOR PALATNIK, and<br>CANAFARMA HEMP PRODUCTS CORP.,<br><br>                              Defendants. | **COMPLAINT**<br><br>Civil Action No. 1:22-cv-1537<br><br>JURY TRIAL DEMANDED |

Plaintiff, as and for its Complaint against Defendants Vitaly Fargesen ("Fargesen"), Igor Palatnik ("Palatnik"), and CanaFarma Hemp Products Corp. ("Company"), (collectively "Defendants"), alleges as follows:

## INTRODUCTION

1.     Defendants committed a massive fraudulent investment offering. They raised millions of dollars from investors for a start-up hemp company named CanaFarma by misrepresenting how investor funds would be utilized and about the Company's business prospects.

2.     The Company's publicly stated business plan was to cultivate and grow hemp in New York and then sell hemp-based products directly to retail customers.

3.     From March 2019 through in or about October 2020 ("Time Span"), the Defendants solicited and raised about $15 million from more than 60 investors, including the Plaintiff.

4.     Plaintiff and the other investors were told that their funds would be used to pay for the Company's business operations.

5.     Starting in or around April 2019, Fargesen and Palatnik—nominally "vice presidents" but in reality, the Company's controlling persons—stole and misappropriated at least $4 million from those investor funds raised, for personal use or for other improper reasons.

1

6.    The Defendants hid their theft from potential investors by using fraudulent and fake financial projections backed up by counterfeit contracts and invoices designed and intended to make those payments appear to be legitimate business costs.

7.    The Defendants also disseminated, made, and communicated to investors numerous additional material misrepresentations and omissions regarding and relating to the Company and its business.

8.    By way of example, Fargesen and Palatnik told potential investors in writing and orally that the Company was a "fully integrated" business that was processing the hemp from its farms and using its oil in its products. However, the reality was that the firm did not process any of this hemp, and its products contained third-party help oil.

9.    Fargesen and Palatnik also represented and stated that the Company was led by a Chief Exeutive Officer—Executive # 1—but omitted to state or disclose that this person was a figurehead with no ability to make substantive Company decisions and instead, took orders and instructions directly from Fargesen and Palatnik.

10.   The Defendants gave investors—including the Plaintiff—financial information that misstated historical revenue figures and amounts and contained baseless claims and projections about future income that were not supported by their own private forecasts.

11.   Fargesen and Palatnik also touted the quality of the Company's management, which was alleged to have been led an experienced CEO.

12.   The reality of the situation was that that person was a mere puppet or figurehead because the Company was wholly dominated and controlled by Fargesen and Palatnik.

13.   Investors—including the Plaintiff—paid as much as $0.50 ($0.63 Canadian Dollars) for each Company share they bought through the Defendants' securities offerings. Those shares are worth a fraction of that amount today.

2

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 13311, § 1332, and § 1367, and 15 U.S.C. § 77q(a), and 15 U.S.C. § 78j(b).

15.     Venue is proper pursuant to 28 U.S.C. § 139, 15 U.S.C. § 77v(a), and 15 U.S.C. § 78aa, because some of the acts, omissions, and transactions at issue occurred in the Southern District of New York

16.     During the Time Span, the Company had offices is New York County, and Fargesen and Palatnik used those offices for Company business and investor meetings.

## DEFENDANTS

17.     During the Time Span the Company was a Canadian corporation with offices in Vancouver, Canada, New Jersey, and New York County.

18.     The Company was formed in June 2017 under the name KYC Technology Inc. ("KYC").

19.     KYC acquired a privately held Delaware company called CanaFarma Corp. ("CF Corp.") as part of a reverse merger in March 2020.

20.     After the merger, the Company changed its name to CanaFarma Hemp Products Corp. It then became listed on the Canadian Stock Exchange ("CSE") (ticker: CNFA.CN), the Frankfurt Stock Exchange ("FSE") (tickers: 4K9.F, 4K9.MU, and 4K9.BE), and is quoted on an unsolicited basis on OTC Markets (ticker: CNFHF).

21.     Vitaly Fargesen ("Fargesen"), is a New Jersey resident.

22.     Igor Palatnik ("Palatnik") is a New Jersey resident.

23.     Fargesen and Palatnik have worked together on multiple business ventures for more than 20 years.

24.     During the Time Span, Fargesen and Palatnik were officers and shareholders of the Company and directed and controlled all or virtually all of the Company's business operations and

investment activities, as well as its statements and omissions.

25.    On October 5, 2021, the U.S. Attorney's Office for the Southern District of New York ("USAO SDNY") unsealed a criminal indictment charging Fargesen and Palatnik with securities fraud, wire fraud, and conspiracies to commit both securities fraud and wire fraud in connection with the Company investment offering fraud described herein. *See United States v. Vitaly Fargesen and Igor Palatnik*, 21 Cr. 602 (S.D.N.Y.) ("Criminal Case"). **Exhibit A**.

26.    On or about October 5, 2021, the Securities and Exchange Commission filed a civil action in the Southern District of New York against the Defendants alleging securities fraud. *See Securities and Exchange Commission v. Canafarma Hemp Products Corp., Vitaly Fargesen, and Igor Palatnik*, 21 Civ. 8211. **Exhibit B**.

## FACTS

I.    BACKGROUND ON THE COMPANY

      A.    Founding

27.    Fargesen and Palatnik founded CanaFarma Hemp Products Corp. as a "farm-to-table" hemp business that would ostensibly grow its own hemp, process it into hemp oil, and then sell products containing that oil directly to consumers.

28.    Fargesen and Palatnik formed CF Corp. and planned to merge it into a Canadian shell company in order to allow the resulting entity to be listed on American and international stock exchanges. This transaction is known as a "reverse merger."

29.    Fargesen and Palatnik incorporated CF Corp. in March 2019. At that time, Fargesen was the president of the company, and he and Palatnik were both directors and 50% owners.

30.    In or about March 2019, Fargesen and Palatnik purchased KYC—a Canadian shell company—from a Canadian Bank ("CB-1").

31.    Fargesen and Palatnik each owned 10 million shares of CF Corp. on April 21, 2019.

B.    Doctored Financial Projections

32.    In or about late 2018, Fargesen and Palatnik contacted Executive #2 and Executive #3 to gauge their interest in selling and marketing a hemp-based business.

33.    Fargesen and Palatnik told Executive #2 and Executive #3 that both of them had experience taking companies public, that they had already found a suitable public shell, and that they had obtained commitments from investors.

34.    Executive #2 and Executive #3 provided sales and marketing services to the Company though an existing company they controlled called Company #1.

35.    During the Time Span, Executive #2 and Executive #3 acted and served as Senior Vice Presidents of Sales and Marketing at the Company.

36.    Company #1 provided sales and marketing services to the Company under an agreement between Company #1 and CF Corp. dated as of April 22, 2019.

37.    The agreement between Company #1 and CF Corp. contained a financial model showing the projected revenue and expenses of the Company for its first two years ("Model"). Those expenses included a projected marketing budget for Company # 1.

38.    Executive #2 and Executive #3 prepared initial drafts of the Model, and they projected approximately $25 million in revenue for the Company in its first year of operations.

39.    Fargesen subsequently directed that the Model be changed to include approximately $1.35 million in additional "set-up" and other short-term expenses for the sales and marketing services of Company # 1.

40.    Fargesen arranged and instructed that these additional costs be added to the Model in order to disguise planned payments to Fargesen and Palatnik that were not for legitimate business expenses.

41.    Fargesen and Palatnik used the financial projections contained in the Model to solicit the

Plaintiff and other potential investors in the Company.

    C.    <u>Fargesen and Palatnik Control the Company</u>

42.    Fargesen and Palatnik had and exercised total and complete control over the Company during the Time Span. Among other things, Fargesen and Palatnik led and directed all investor fundraising, all business decisions, and all payments made from Company bank accounts.

43.    Fargesen and Palatnik hired Executive #1 as the Company's CEO in March 2019.

44.    Fargesen and Palatnik told Executive #1 and other persons at the Company that Executive # 1 would act as a mere figurehead CEO, and that he would not make any real decisions.

45.    The Company maintained bank accounts at U.S. Bank #1 and U.S. Bank #2 during the Time Span.

46.    Fargesen and Palatnik opened the Company bank account at U.S. Bank #1 in March 2019, and they were the only people with signature authority on that account.

47.    Executive #1 opened the Company bank account at U.S. Bank #2 in April 2019.

48.    Executive #1 initially had signature authority on the Company bank account at U.S. Bank #2, Palatnik directed Executive #1 to add Palatnik as a signer on the account on or about May 14, 2019, and then to remove Executive #1 as a signer on or about June 19, 2019.

    D.    <u>Hemp Farms and Products</u>

49.    The Company's primary product during the Time Span was a chewing gum containing hemp oil. It was sole directly to customers during this time.

50.    The Company did not manufacture this product. It acquired the product though a license agreement with a third party (Licensor #1), and then sold it under its own white-label brand name ("Yooforic").

51.    The Company leased two hemp farms during the Time Span.

52.    The first farm was located in Dutchess County, New York, and was leased from April to

December 2019.

53.　The second hemp farm was located near Syracuse, New York, and was leased from February 2020 through the end of the Time Span.

54.　The Company used Plaintiff's and other investor's funds to make total payments of at least $3.5 million for hemp "grows" at these two farms in 2019 and 2020.

55.　Although these farms grew and harvested hemp, the Company did not process any of its hemp into hemp oil. It did not use any of this hemp in any of its products during the Time Span.

56.　The Company kept the hemp grown for it on these farms in 2019 and 2020 in storage, and it was not used.

57.　Licensor # 1 used hemp oil purchased from a source other than the hemp grown at the two farms leased by the Company to produce Yooforic.

58.　On or about April 17, 2019, Fargesen told an individual with whom Fargesen and Palatnik were discussing the Company's business that they were making payments to the first hemp farm "just for the story." Palatnik was present during this conversation.

59.　The Company started generating revenue from the sales of its product in June 2019.

60.　From June 2019 through November 2019, the Company generated total revenue of approximately $3.1 million.

61.　In September 2019, the Company's revenue was approximately $832,000. This was the most money it earned in a single month during the Time Span.

62.　The Company's monthly revenue dropped to approximately $68,000.00 by February 2020.

63.　Thereafter, the Company's monthly revenue continued to fall to approximately $44,000 in March 2020, and roughly $26,000 in June 2020.

64.　Fargesen and Palatnik were aware of the Company's monthly revenue amounts and decline during the Time Span.

II.   THE COMPANY'S SECURITIES OFFERINGS

65.   During the Time Span, the Company raised approximately $15 million from investors around the world, including in the United States, through two securities offerings.

66.   Between March and November 2019, CF Corp. raised approximately $11.3 million from investors through private sales of shares of CF Corp. ("First Offering").

67.   In June 2020, the Company raised more than $3.7 million from investors through a private share sale of the Company ("Second Offering").

68.   Plaintiff invested approximately $1,500,000 (1,890,000 Canadian Dollars) in the Second Offering. The company's subscription agreement is attached as **Exhibit C**.

69.   Between the time of the First Offering and the Second Offering, KYC completed its reverse merger with CF Corp. in March of 2020 and became listed on the CSE and the FSE.

70.   At the time of the reverse merger, Fargesen and Palatnik still owned 10 million shares of CF Corp.

71.   After the reverse merger, Fargesen and Palatnik each owned 8,727,749 shares of the Company.

72.   More than 60 investors located in seven states and ten countries invested in either the First Offering or the Second Offering, including at least eleven (11) investors located in New York County.

73.   Executive #1, Fargesen, or Palatnik typically sent prospective investors in both offerings a subscription agreement, a business plan or investor presentation, and a shorter summary of the Company's business and the investment opportunity ("Investment Materials").

74.   When Executive #1 sent the Investment Materials by email to a potential investor, Executive #1 typically wrote that Executive # 1 did so at the request of Fargesen or Palatnik.

75.   In communications with potential investors, including in emails sending the Investment

Materials, Executive # 1 represented that Executive #1 was the CEO of the Company.

76. Fargesen and Palatnik then met or spoke with potential investors to pitch the Company and the investment opportunity. Certain of these meetings took place in Manhattan, including at the Company's offices.

77. Fargesen and Palatnik principally wrote the sections of the Investment Materials that described the offerings (included those portions setting the Company's valuation and share price) and the Company's structure and business.

78. The Investment Materials provided to potential investors in both the First Offering and the Second Offering stated that the Company had offices in Manhattan and listed a Manhattan office address as the address for Executive #1. Executive #1 was the person to whom an investor was required to return a signed subscription agreement.

79. Investors in the First Offering paid either $0.10 or $0.25 per share.

80. Investors in the Second Offering—including the Plaintiff—paid approximately $0.50 per share (or $0.63 per share in Canadian dollars).

III.   MISAPPROPRIATION OF INVESTOR FUNDS

81. The Investment Materials provided to potential investors in both the First Offering and the Second Offering state explicitly or imply that raised funds would be (and were previously used) used for the Company's business purposes.

82. For example, one version of the summary document sent to investors in the First Offering stated that the money raised from investors "will be used primarily for the funding of additional grow facilities and as the marketing dollars to fuel our direct response marketing engine."

83. In a later version of the subscription agreement used in the First Offering, investors were told that the Company would use investment funds for "general working capital purposes and for

expenses incurred in connection with listing the Company's common stock on the [CSE.]"

84.    Investment Materials provided to some investors in the First Offering stated that the Company had already raised $6 million or $7 million.

85.    Investment Materials provided to investors in the Second Offering stated that the Company had already raised $12 million.

86.    The truth of the matter was that Fargesen and Palatnik had misappropriated at least $4 million from the Company bank accounts during the Time Span.

87.    In each of the following examples, Fargesen and Palatnik either transferred the money themselves or directed others to make the transfers out of the Company bank accounts (which contained funds primarily provided by investors) to another entity called Direkt Finance, LLC ("Direkt"), or to the Company's largest shareholder (Shareholder #1).

88.    Palatnik was and is the sole owner and member of Direkt.

89.    Fargesen and Palatnik failed to disclose any of these payments to subsequent investors (including in the Investment Materials).

90.    Fargesen and Palatnik also disguised the payments in the budgets and projections provided to investors or reversed the payments month after they were made.

    A.    Example One

91.    Between April 25, 2019, and July 19, 2019, Fargesen and Palatnik misappropriated over $1.35 million invested in the First Offering through a series of transfers that ended with transfers to Direkt.

92.    Fargesen and Palatnik transferred these funds out of the Company bank account at U.S. Bank #1 using a combination of wire transfers and checks signed by Fargesen.

93.    Fargesen directed that the Model include approximately $1.35 million in additional set-up and marketing costs for Company # 1, in order to hide the payments as part of the marketing

budget for Company # 1.

94.  Fargesen and Palatnik then directed others at Company to prepare false invoices that broke the payments into multiple smaller ones, and that indicated that the initial payments by the Company to Company #1 were for legitimate marketing services.

95.  Fargesen and Palatnik also instructed that the payments be routed through multiple bank accounts—including the bank account for Company #1—before reaching Direkt.

96.  Direkt's bank records show that Fargesen and Palatnik used these funds for personal expenses, for checks written to themselves, or to fund their personal bank accounts. They were not used for legitimate Company marketing expenses.

B.  Example Two

97.  Between September 26, 2019, and October 31, 2019, Fargesen and Palatnik transferred a total of $2 million from the Company's bank account at U.S. Bank #1 (which primarily held funds from First Offering investors) to Shareholder #1's company.

98.  Fargesen and Palatnik caused the Company to make these payments to Shareholder #1's company because Shareholder # 1 requested that the Company return a portion of Shareholder #1's family's multimillion-dollar investment in the Company.

99.  Shareholder #1 did not, however, return the Company shares that the Company had issued in exchange for this investment.

100.  At the direction of Palatnik, Executive #1 signed a sham consulting agreement on behalf of Company with Shareholder #1's company. That agreement was the purported basis for the $2 million in payments made by the Company to Shareholder #1's company.

101.  Executive #1 signed this agreement on or about October 19, 2019, which was after the Company had already transferred $1.5 million of the $2 million to Shareholder #1's company. The agreement was dated as of September 23, 2019, three days before the first payment.

102.  In or about May 2020, Fargesen and Palatnik admitted to others at the Company that the true purpose of the $2 million in payments to Shareholder #1's company was to return a portion of Shareholder #1's family's investment.

103.  Fargesen and Palatnik also admitted to others at the Company that they (Fargesen and Palatnik) knew that Shareholder # 1's company submitted documents to the Company concerning services that were never provided in order to substantiate the payments.

104.  After the Company's auditors and others at the Company raised questions about these payments, Shareholder #1's company returned $1,665,000 to the Company on June 15, 2020.

105.  Shareholder #1's company retained the balance of these funds—$335,000—as payment for purported social media marketing work that Shareholder #1's company did not actually perform.

C.     Example Three

106.  Between January 24, 2020, and February 28, 2020, Fargesen and Palatnik misappropriated another $374,000 from the Company's bank accounts, which were primarily funded with First Offering investor money.

107.  Fargesen and Palatnik transferred these funds out of the Company's bank account at U.S. Bank #1 by wire transfer. The wire transfers themselves state that the payments were for a "roadshow."

108.  Fargesen and Palatnik told others at the Company that these payments represented prepayments for a Company investor roadshow which was to take place in Europe.

109.  Direct bank records show, however, that Fargesen and Palatnik used these funds for personal expenses (including the purchase of a luxury car) or to fund their personal bank accounts.

110.  No roadshow in Europe or any other location ever took place.

D.    Example Four

111.    The Company's monthly sales revenue was approximately $33,000 in July 2020.

112.    In August 2020, Fargesen, Palatnik, and Shareholder #1 agreed to a "revenue recycling" scheme to inflate the sales revenues that were reported to Company investors.

113.    Specifically, Fargesen, Palatnik, and Shareholder #1 agreed that (a) Fargesen and Palatnik would transfer funds out of Company bank accounts to entities controlled by Shareholder #1 and located outside of the Unites States, as payment for fictitious services, and (b) other companies controlled by Shareholder #1 would then send the funds back to the Company at a later date as purported sales revenue from product sales that did not in fact occur.

114.    On or about September 17, 2020, the Company transferred a total of $350,000 out of its bank account at U.S. Bank #2 through two separate wire transfers to two companies controlled by Shareholder #1. These transfers were primarily funded with investor funds from the Second Offering. The payments and transfers were made and done at the direction of Palatnik.

115.    In October 2020, another company controlled by Shareholder #1 sent the Company a total of $376,250.

116.    The Company failed to disclose in any of the Investment Materials that it would use investor funds for phantom transactions intended to create the appearance of higher sales revenues.

IV.    ADDITIONAL MATERIAL MISREPRESENTATIONS AND OMISSIONS TO INVESTORS

117.    The Investment Materials provided to investors falsely stated that the Company had an "integrated" business that included processing hemp into hemp oil that was then used in the Company's products (i.e., Yooforic-branded products such as chewing gum).

118.    In the business plan provided to potential investors in the First Offering, the Company wrote that it was "the only producer in the CBD market with its own . . . Processing facility."

119.    In the summary provided with that business plan, the Company stated that it was a "fully

integrated cannabis company addressing the entire cannabis spectrum from seed to delivery of consumer products."

120. Another investor presentation provided to potential investors in the First Offering, the Company described its business as "vertically integrated – cultivation, processing and sales of hemp oil infused products." Fargesen was listed as the Company contact person in this investor presentation.

121. In an investor presentation provided to potential investors in the Second Offering, the Company described its "Vertical Integrated Hemp Business" as follows: "From seed to counter, our fully integrated hemp business helps us promote in-demand hemp oil infused products that continue to fuel the direct response marketing engine." The investor presentation then includes "processing" as one of the ways the Company business was "integrated."

122. This investor presentation also stated that the Company "independently grows, produces, promotes, sells, and ships our own products," and that the Company had as a "notable resource" its own "Fully Certified, Clean Processing Facility."

123. In addition to written materials, during investor presentations, Fargesen orally gave potential investors, on at least the First Offering, the impression that the Company grew and processed its own hemp and then used the resulting hemp oil in its products.

124. In reality, the Company did not process any of the hemp that was grown at the farms it leased during the Time Span, and none of the products it sold contained hemp oil from the hemp grown at these farms.

125. By the time of the Second Offering, the Company's first hemp grow remained unprocessed and was sitting unused in storage.

126. The business plan sent to potential investors in the First Offering contained a section with purported "Testimonials" given by some of the "first users" of "the Company's superior

differentiated product."

127. These testimonials were not related to the Company's product (Yooforic chewing gum), but were in fact testimonials for another hemp-based product that the Company never sold.

128. Fargesen and Palatnik included these misleading testimonials in the business plan.

129. The Investment Materials provided to potential investors contained misrepresentations and omissions about past and projected sales revenues.

130. For example, Investment Materials for the First Offering "guaranteed" $25 million and projected as much as $100 million in first-year revenue for the Company.

131. In reality, the Company employees directly responsible for the product development and marketing work that drove these revenue projections had projected (but did not guarantee) $25 million in first-year revenue.

132. Additionally, the Investment Materials for the First Offering stated that revenue projections were based on a marketing budget of $3 million that would be used "to pay the affiliate networks for the sales that they generate."

133. However, as described above, this $3 million figure included $1.35 million that Fargesen and Palatnik misappropriated from the Company, and which was not used for marketing purposes.

134. Not only was this misappropriation not disclosed to potential investors, but the Investment Materials for the First Offering stated that the Company used a "pay for performance" marketing model where it "does not incur a marketing expense unless actual sales are made."

135. In the Second Offering, an investor presentation stated that the Company had surpassed $4 million in revenue in either its first six months of sales or its "first quarter," and that in March 2020, the Company was "[n]ow achieving nearly $1,000,000 per month revenue."

136. None of these statements were true. In reality, the Company achieved approximately $3.1 million in revenue in its first six months of sales and only approximately $44,000 in

revenue in March 2020. The Company never reached $1 million in monthly revenue during the Time Span.

137. Because Fargesen and Palatnik were aware of the Company's monthly revenue numbers during the Time Span, they knew or were reckless in not knowing that these statements to potential investors in the Second Offering were false and misleading.

138. The Investment Materials provided to potential investors in both offerings touted the high quality of the Company's management team, suggesting it was headed by Executive #1 as CEO and that Fargesen and Palatnik were mere officers who reported to Executive #1.

139. Executive #1 signed documents and took direction as to all aspects of the business from Fargesen and Palatnik.

140. The Investment Materials did not disclose that Executive #1 was acting as a false figurehead CEO, nor did the Defendants otherwise disclose that information to investors.

141. The Investment Materials provided to potential investors in at least the First Offering also stated that the owners of Licensor #1—the third-party from which the Company was licensing its hemp oil chewing gum—were part of the Company organization.

142. For example, organizational charts contained in the Investment Materials provided to potential investors in the First Offering described the owners of Licensor #1 as part of the Company's "Management Team" and indicated that they reported to Palatnik.

143. In reality, neither the owners of Licensor #1 nor Licensor #1 itself were part of the Company at all.

V.  THE COMPANY SHARES SOLD TO INVESTORS QUALIFIED AS A PENNY STOCK

144. Company stock shares sold to investors in both the First Offering and the Second Offering qualified as a penny stock as defined by Section 3(a)(51) of the Exchange Act and Rule 3a51-1 thereunder: (a) Company stock was not an "NMS stock," as defined in 17 C.F.R. §

242.600(b)(47); (b) Company stock traded below five dollars per share during the Time Span;

(c) Company had net tangible assets and average revenue below the thresholds of Rule 3a51-

1(g)(1); and (d) the Company did not meet any other exceptions contained in Rule 3a51-1.

145.   As of February 9, 2022, the Company is trading at approximately $0.02 on the OTC.

**As and For the First Cause of Action**
**Violations of Securities Act Section 17(a)**

146.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs

as if fully set forth herein again at length.

147.   Defendants fraudulently induced Plaintiff to make an investment through the use of materially

false and misleading documents, statements, sales materials, and oral presentations.

148.   Defendants knowingly transmitted and disseminated to Plaintiff, directly and through its

agents, materially false and misleading statements, as more fully described above, describing

and recommending the purchase of securities and investment interests purchased by Plaintiff.

149.   At the time of the misstatements and omissions and concealments as described above, the

Defendants, and each of them, knew or reasonably should have known that such statements

were materially false and misleading, and omitted facts required in order to make the

statements made, in light of the circumstances under which they were made, not misleading,

but knowingly or recklessly made such statements to Plaintiff in order to induce the company

to purchase the investments and the interests.

150.   Plaintiff reasonably relied on the information provided to it and statements made by Fargesen

and Palatnik and their agents recommending the purchase of the securities. At the time of such

investments, Plaintiff had no knowledge that the information and recommendations provided

by the Defendants contained material misstatements of material facts and omission or

concealments of material facts.

151.   Plaintiff would not have purchased the securities and investment interests but for the

17

materially false and misleading information provided to him by the Defendants.

152. Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (i) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (ii) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

153. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated Securities Act Section 17(a) [15 U.S.C. §77q(a)].

**As and For the Second Cause of Action**
**Violations of § 10(B)(5) of the Exchange Act**

154. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein again at length.

155. Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

156. By reason of the foregoing, directly or indirectly, singly or in concert, the Defendants have

violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### As and for the Third Cause of Action
### Negligent Misrepresentation

157.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein again at length.

158.    The Defendants owed to the Plaintiff a duty: (a) to act with reasonable care in preparing and disseminating the information as set forth in the written materials, including the Business Plan and Executive Summary for Investors and other representative materials upon which offered representations that were relied upon by the Plaintiff in deciding to purchase the investments; and (b) to use such reasonable diligence in determining the accuracy of and preparing the information contained therein, knowing that such information would be relied upon by the investing public.

159.    The Defendants breached their duty to the Plaintiff by failing to investigate, confirm, prepare, and review with reasonable care the information contained in the written materials and other representations, and by failing to disclose to the Plaintiff, among other things, the facts as alleged above, and in failing to collect the misstatements, omissions, and accuracies contained therein at such time as the Defendants knew or reasonably should have known of the misstatements, inaccuracies, concealments, omissions, and misrepresentations.

160.    As a direct foreseeable and proximate result of the negligence, reckless, and carelessness of the Defendants, and each of them, jointly, severally, individually, and together, the Plaintiff has sustained damages and has lost a substantial part if not all of its investment, together with lost interest, general and incidental damages, all in the approximate amount of $1,500,000.00, with the exact amount to be determined a trial.

### As and for the Fourth Cause of Action
### <u>Unjust Enrichment</u>

161.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein again at length.

162.    Defendants received money or property belonging to or provided by the Plaintiff.

163.    Defendants benefited from the receipt of the money and/or property.

164.    Under principles of equity and good conscience, Defendants have been unjustly enriched and should be ordered to pay the Plaintiff the amount by which they were unjustly enriched.

### <u>Demand for Jury Trial</u>

165.    Plaintiff demands a trial by jury pursuant to FRCP 38.

**WHEREFORE,** Plaintiff demands judgment against Defendants as follows:

A.   On the First Cause of action, compensatory damages in an amount estimated to exceed the sum of $1,500,000.00, with the exact amount to be determined at trial; and

B.   On the Second Cause of action, compensatory damages in an amount estimated to exceed the sum of $1,500,000.00, with the exact amount to be determined at trial; and

C.   On the Third Cause of action, compensatory damages in an amount estimated to exceed the sum of $1,500,000.00, with the exact amount to be determined at trial; and

D.   On the Fourth Cause of action, compensatory damages in an amount estimated to exceed the sum of $1,500,000.00, with the exact amount to be determined at trial; and

E.   Awarding Plaintiff the costs and disbursements incurred in this action, including reasonable attorney's fees; and

F.   For such other and further relief as this Court may deem just, equitable, and proper.

Dated:                      New York, New York
                            February 24, 2022


                                         Respectfully submitted,
                                         **WARREN LAW GROUP**
                                         By: /s/ Christopher D. Warren
                                         *Attorneys for Plaintiff*
                                         Christopher D. Warren, Esq.
                                         14 Penn Plaza, 9th Floor
                                         New York, NY 10122
                                         212-580-2303
                                         chris@warren.law